FILED
COURT OF APPEALS
DIVISION II

2014 OCT 28 AM 10: 03

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KITSAP COUNTY, a political subdivision of the State of Washington, | Consol. Nos. 43076-2-II<br>43243-9-II |
| Respondent, | |
| v. | |
| KITSAP RIFLE AND REVOLVER CLUB, a not-for-profit corporation registered in the State of Washington, and JOHN DOES and JANE DOES I-XX, inclusive, | PUBLISHED OPINION |
| Appellants. | |
| IN THE MATTER OF THE NUISANCE AND UNPERMITTED CONDITIONS LOCATED AT<br>One 72-acre parcel identified by Kitsap County Tax Parcel ID No. 362501-4-002-1006 with street address 4900 Seabeck Highway NW, Bremerton, Washington, | |
| Defendant. | |

MAXA, J. — The Kitsap Rifle and Revolver Club appeals from the trial court's decision following a bench trial that the Club engaged in unlawful uses of its shooting range property. Specifically, the Club challenges the trial court's determinations that the Club had engaged in an impermissible expansion of its nonconforming use; that the Club's site development activities violated land use permitting requirements; and that excessive noise, unsafe conditions, and unpermitted development work at the shooting range constituted a public nuisance. The Club

also argues that even if its activities were unlawful, the language of the deed of sale transferring the property title from Kitsap County to the Club prevents the County from filing suit based on these activities. Finally, the Club challenges the trial court's remedies: terminating the Club's nonconforming use status and entering a permanent injunction restricting the Club's use of the property as a shooting range until it obtains a conditional use permit, restricting the use of certain firearms at the Club, and limiting the Club's hours of operation to abate the nuisance.[1]

We hold that (1) the Club's commercial use of the property and dramatically increased noise levels since 1993, but not the club's change in its operating hours, constituted an impermissible expansion of its nonconforming use; (2) the Club's development work unlawfully violated various County land use permitting requirements; (3) the excessive noise, unsafe conditions, and unpermitted development work constituted a public nuisance; (4) the language in the property's deed of sale from the County to the Club did not preclude the County from challenging the Club's expansion of use, permit violations, and nuisance activities; and (5) the trial court did not abuse its discretion in entering an injunction restricting the use of certain firearms at the shooting range and limiting the Club's operating hours to abate the public nuisance. We affirm the trial court on these issues except for the trial court's ruling that the Club's change in operating hours constituted an impermissible expansion of its nonconforming use. We reverse on that issue.

---

[1] The County initially filed a cross appeal. We later granted the County's motion to dismiss its cross appeal.

2

However, we reverse the trial court's ruling that terminating the Club's nonconforming use status as a shooting range is a proper remedy for the Club's conduct. Instead, we hold that the appropriate remedy involves specifically addressing the impermissible expansion of the Club's nonconforming use and unpermitted development activities while allowing the Club to operate as a shooting range. Accordingly, we vacate the injunction precluding the Club's use of the property as a shooting range and remand for the trial court to fashion an appropriate remedy for the Club's unlawful expansion of its nonconforming use and for the permitting violations.

## FACTS

The Club has operated a shooting range in its present location in Bremerton since it was founded for "sport and national defense" in 1926. Clerk's Papers (CP) at 4054. For decades, the Club leased a 72-acre parcel of land from the Washington Department of National Resources (DNR). The two most recent leases stated that the Club was permitted to use eight acres of the property as a shooting range, with the remaining acreage serving as a buffer and safety zone.

*Confirmation of Nonconforming Use*

In 1993, the chairman of the Kitsap County Board of Commissioners (Board) notified the Club and three other shooting ranges located in Kitsap County that the County considered each to be lawfully established, nonconforming uses. This notice was prompted by the shooting ranges' concern over a proposed new ordinance limiting the location of shooting ranges. (Ordinance 50-B-1993). The County concedes that as of 1993 the Club's use of the property as a shooting range constituted a lawful nonconforming use.

3

*Property Usage Since 1993*

As of 1993, the Club operated a rifle and pistol range, and some of its members participated in shooting activities in the wooded periphery of the range. Shooting activities at the range occurred only occasionally – usually on weekends and during the fall "sight-in" season for hunting – and only during daylight hours. CP at 4059. Rapid-fire shooting, use of automatic weapons, and the use of cannons occurred infrequently in the early 1990s.

Subsequently, the Club's property use changed. The Club allowed shooting between 7:00 AM and 10:00 PM, seven days a week. The property frequently was used for regularly scheduled shooting practices and practical shooting competitions where participants used multiple shooting bays for rapid-fire shooting in multiple directions. Loud rapid-fire shooting often began as early as 7:00 AM and could last as late as 10:00 PM. Fully automatic weapons were regularly used at the Club, and the Club also allowed use of exploding targets and cannons. Commercial use of the Club also increased, including private for-profit companies using the Club for a variety of firearms courses and small arms training exercises for military personnel. The U.S. Navy also hosted firearms exercises at the Club once in November 2009.

The expanded hours, commercial use, use of explosive devices and higher caliber weaponry, and practical shooting competitions increased the noise level of the Club's activities beginning in approximately 2005 or 2006. Shooting sounds changed from "occasional and background in nature, to clearly audible in the down range neighborhoods, and frequently loud, disruptive, pervasive, and long in duration." CP at 4073. The noise from the Club disrupted neighboring residents' indoor and outdoor activities.

4

The shooting range's increased use also generated safety concerns. The Club operated a "blue sky" range with no overhead baffles to stop the escape of accidentally or negligently discharged bullets. CP at 4070. There were allegations that bullets had impacted nearby residential developments.

*Range Development Since 1996*

From approximately 1996 to 2010, the Club engaged in extensive shooting range development within the eight acres of historical use, including: (1) extensive clearing, grading, and excavating wooded or semi-wooded areas to create "shooting bays," which were flanked by earthen berms and backstops; (2) large scale earthwork activities and tree/vegetation removal in a 2.85 acre area to create what was known as the 300 meter rifle range;[2] (3) replacing the water course that ran across the rifle range with two 475-foot culverts, which required extensive work – some of which was within an area designated as a wetland buffer; (4) extending earthen berms along the rifle range and over the newly buried culverts which required excavating and refilling soil in excess of 150 cubic yards; and (5) cutting steep slopes higher than five feet at several locations on the property.

The Club did not obtain conditional use permits, site development activity permits, or any of the other permits required under the Kitsap County Code for its development activities.

*Club's Purchase of Property*

In early 2009, the County and DNR negotiated a land swap that included the 72 acres the Club leased. Concerned about its continued existence, the Club met with County officials to

---

[2] The Club abandoned its plans to develop the proposed 300 meter rifle range because County staff advised the Club that a conditional use permit would be required for the project.

discuss the transaction's potential implications on its lease. The Club was eager to own the property to ensure its shooting range's continued existence, and the County was not interested in owning the property because of concern about potential heavy metal contamination from its long term shooting range use. In May 2009, the Board approved the sale of the 72-acre parcel to the Club.

In June, DNR conveyed to the County several large parcels of land, including the 72 acres leased by the Club. The County then immediately conveyed the 72-acre parcel to the Club through an agreed bargain and sale deed with restrictive covenants.

The bargain and sale deed states that the Club "shall confine its active shooting range facilities on the property consistent with its historical use of approximately eight (8) acres of active shooting ranges." CP at 4088. The deed also states that the Club may "upgrade or improve the property and/ or facilities within the historical approximately eight (8) acres in a manner consistent with 'modernizing' the facilities consistent with management practices for a modern shooting range." CP at 4088. The deed does not identify or address any property use disputes between the Club and County.

*Lawsuit and Trial*

In 2011, the County filed a complaint for an injunction, declaratory judgment, and nuisance abatement against the Club. The County alleged that the Club had impermissibly expanded its nonconforming use as a shooting range and had engaged in unlawful development activities because the Club lacked the required permits. The County also alleged that the Club's activities constituted a noise and safety public nuisance. The County requested termination of the Club's nonconforming use status and abatement of the nuisance.

After a lengthy bench trial, the trial court entered extensive findings of fact and conclusions of law. The trial court concluded that the Club's shooting range operation was no longer a legal nonconforming use because (1) the Club's activities constituted an expansion rather than an intensification of the existing nonconforming use; (2) the Club's use of the property was illegal because it failed to obtain proper permits for the development work; and (3) the Club's activities constituted a nuisance per se, a statutory public nuisance, and a common law nuisance due to the noise, safety, and unpermitted land use issues. The trial court issued a permanent injunction prohibiting use of the Club's property as a shooting range until issuance of a conditional use permit, which the County could condition upon application for all after-the-fact permits required under Kitsap County Code (KCC) Title 12 and 19. The trial court also issued a permanent injunction prohibiting the use of fully automatic firearms, rifles of greater than nominal .30 caliber, exploding targets and cannons, and the property's use as an outdoor shooting range before 9:00 AM or after 7:00 PM.

The Club appeals. We granted a stay of the trial court's injunction against all shooting range activities on the Club property until such time as it receives a conditional use permit. However, we imposed a number of conditions on the Club's shooting range operations pending our decision.

## ANALYSIS

### *STANDARD OF REVIEW*

We review a trial court's decision following a bench trial by asking whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law. *Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

Substantial evidence is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). Here, the Club did not assign error to any of the trial court's findings of fact, and only challenged four findings regarding the deed in its brief.[3] Accordingly, we treat the unchallenged findings of fact as verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 100 P.3d 805 (2004).

The process of determining the applicable law and applying it to the facts is a question of law that we review de novo. *Erwin v. Cotter Health Ctrs., Inc.*, 161 Wn.2d 676, 687, 167 P.3d 1112 (2007). We also review other questions of law de novo. *Recreational Equip., Inc. v. World Wrapps Nw., Inc.*, 165 Wn. App. 553, 559, 266 P.3d 924 (2011).

We apply customary principles of appellate review to an appeal of a declaratory judgment reviewing the trial court's findings of fact for substantial evidence and the trial court's conclusions of law de novo. *Nw. Props. Brokers Network, Inc. v. Early Dawn Estates Homeowners' Ass'n*, 173 Wn. App. 778, 789, 295 P.3d 314 (2013).

## THE CLUB'S UNLAWFUL ACTIVITIES

The Club argues that the trial court erred in ruling that the Club's use of the property since 1993 was unlawful because (1) the Club's activities constituted an expansion rather than an intensification of the existing nonconforming use, (2) the Club failed to obtain proper permits for

---

[3] In the body of its brief the Club argued that the evidence did not support findings of fact 23, 25, 26, and 57. These findings primarily involve the trial court's interpretation of the deed transferring title from the County to the Club. Although the Club's challenge to these findings did not comply with RAP 10.3(g), in our discretion we will consider the Club's challenge to these findings.

its extensive development work, and (3) the Club's activities constituted a public nuisance. We disagree and hold that the trial court's unchallenged findings of fact support these legal conclusions.

A.    EXPANSION OF NONCONFORMING USE

The Club argues that the trial court erred in ruling that the Club engaged in an impermissible expansion of the existing nonconforming use by (1) increasing its operating hours; (2) allowing commercial use of the Club (including military training); and (3) increasing noise levels by allowing explosive devices, higher caliber weaponry greater than .30 caliber, and practical shooting. We hold that increasing the operating hours represented an intensification rather than an expansion of use, but agree that the other two categories of changed use constituted expansions of the Club's nonconforming use.

1.    Changed Use – General Principles

A legal nonconforming use is a use that "lawfully existed" before a change in regulation and is allowed to continue although it does not comply with the current regulations. *King County Dep't of Dev. & Envtl. Servs. v. King County*, 177 Wn.2d 636, 643, 305 P.3d 240 (2013); *Rhod-A-Zalea v. Snohomish County*, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998). Nonconforming uses are allowed to continue because it would be unfair, and perhaps a violation of due process, to require an immediate cessation of such a use. *King County DDES*, 177 Wn.2d at 643; *Rhod-A-Zalea*, 136 Wn.2d at 7.

As our Supreme Court noted, as time passes a nonconforming property use may grow in volume or intensity. *Keller v. City of Bellingham*, 92 Wn.2d 726, 731, 600 P.2d 1276 (1979). Although a property owner generally has a right to continue a protected nonconforming use,

there is no right to "significantly change, alter, extend, or enlarge the existing use." *Rhod-A-Zalea*, 136 Wn.2d at 7. On the other hand, an "intensification" of the nonconforming use generally is permissible. *Keller*, 92 Wn.2d at 731. "Under Washington common law, nonconforming uses may be intensified, but not expanded." *City of University Place v. McGuire*, 144 Wn.2d 640, 649, 30 P.3d 453 (2001). Our Supreme Court stated the standard for distinguishing between intensification and expansion:

> When an increase in volume or intensity of use is of such magnitude as to effect a fundamental change in a nonconforming use, courts may find the change to be proscribed by the ordinance. Intensification is permissible, however, where the nature and character of the use is unchanged and substantially the same facilities are used. The test is whether the intensified use is different in kind from the nonconforming use in existence when the zoning ordinance was adopted.

*Keller*, 92 Wn.2d at 731 (internal citations omitted).

In *Keller*, our Supreme Court determined that a chlorine manufacturing company's addition of six cells to bring its building to design capacity (which increased its chlorine production by 20-25 percent) constituted an intensification rather than an expansion, and thus was permissible under the company's chlorine manufacturing nonconforming use status. 92 Wn.2d at 727-28, 731. The court's decision was based on the Bellingham City Code (BCC), which stated that a nonconforming use " 'shall not be enlarged, relocated or rearranged,' " but did not specifically prohibit intensification. *Keller*, 92 Wn.2d at 728 731 (quoting BCC § 20.06.027(b)(2)). The Supreme Court highlighted the trial court's unchallenged factual findings that the addition of the new cells "wrought no change in the nature or character of the nonconforming use" and had no significant effect on the neighborhood or surrounding environment. *Keller*, 92 Wn.2d at 731-32.

2.  Kitsap County Code Provisions

Our Supreme Court in *Rhod-A-Zalea* noted that the Washington statutes are silent regarding regulation of nonconforming uses and that the legislature "has deferred to local governments to seek solutions to the nonconforming use problem according to local circumstances." 136 Wn.2d at 7. As a result, "local governments are free to preserve, limit or terminate nonconforming uses subject only to the broad limits of applicable enabling acts and the constitution." *Rhod-A-Zalea*, 136 Wn.2d at 7. The analysis in *Keller* is consistent with these principles. Accordingly, we first determine whether the Club's increased activity is permissible under the Code provisions that regulate nonconforming uses, interpreted within due process limits.

Title 17 of the Code relates to zoning. KCC 17.460.020 provides:

> Where a lawful use of land exists that is not allowed under current regulations, but was allowed when the use was initially established, that use may be continued so long as it remains otherwise lawful, and shall be deemed a nonconforming use.

This ordinance reflects that generally the Code "is intended to permit these nonconformities to continue until they are removed or discontinued." KCC 17.460.010.

The Code contains two provisions that address when a nonconforming use changes. First, KCC 17.460.020(C) prohibits the geographic expansion or relocation of nonconforming uses:

> If an existing nonconforming use or portion thereof, not housed or enclosed within a structure, occupies a portion of a lot or parcel of land on the effective date hereof, *the area of such use may not be expanded*, nor shall the use or any part thereof, be moved to any other portion of the property not historically used or occupied for such use.

11

(Emphasis added). This ordinance prohibits expansion of only the *area* of a nonconforming use – i.e., the footprint of the use.

With one possible exception,[4] the Club did not violate this provision. The trial court concluded that the Club "enjoyed a legal protected nonconforming status for historic use of the existing eight acre range." CP at 4075. The Club developed portions of its "historic eight acres" by creating shooting bays, beginning preliminary work for relocating its shooting range, and constructing culverts to convey a water course across the range. CP at 4060. There is no allegation that any of this work took place outside the existing area of the Club's nonconforming use. Further, all of the activities that the trial court found constituted an expansion of use took place within the eight acre area.

Second, former KCC 17.455.060 (1998), which was repealed after the trial court rendered its opinion,[5] provided:

> A use or structure not conforming to the zone in which it is located shall not be *altered or enlarged in any manner*, unless such alteration or enlargement would bring the use or structure into greater conformity with the uses permitted within, or requirements of, the zone in which it is located.

---

[4] The one possible violation of KCC 17.460.020 involved the Club's work on the proposed 300 meter range. It is unclear whether the proposed 300 meter range was outside the historic eight acres. The trial court made no factual finding on this issue, although the parties imply that this project went beyond the existing area. In any event, when the County objected the Club discontinued its work in this area. Because the project was abandoned, at the time of trial the Club no longer was in violation of KCC 17.460.020. Apparently, the Club currently is using this area for storage but is willing to move the items if a court determines it is outside its historical use area.

[5] Neither party discusses the effect of former KCC 17.455.060 being repealed. Because we interpret this ordinance consistent with the common law, we need not address this issue.

12

(Emphasis added). The court in *Keller* determined that the term "enlarged" in the ordinance at issue did not prohibit intensification. 92 Wn.2d at 731. "Alter" is defined as "to cause to become different in some particular characteristic . . . without changing into something else." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 63 (2002). Arguably, the prohibition on *altering* a nonconforming use could be interpreted as prohibiting every intensification of that use. But the County does not argue that former KCC 17.455.060 prohibits intensification. Further, as in *Keller*, the Code does not expressly prohibit intensification of a nonconforming use. And interpreting former KCC 17.455.060 strictly to prohibit any change in use would conflict with the rule that zoning ordinances in derogation of the common law should be strictly construed. *Keller*, 92 Wn.2d at 730.

Based on these factors, we interpret former KCC 17.455.060 as adopting the common law and prohibiting "expansion" but not "intensification" of a nonconforming use. As a result, we must analyze whether the Club's use since 1993 constitutes an expansion or intensification of use under common law principles.

3.    Expansion vs. Intensification

As discussed above, *Keller* described the concept of "expansion" as an increase in the volume or intensity of the use of such magnitude that effects a "fundamental change" in the use, and the concept of "intensification" as where the "nature and character" of the use is unchanged and substantially the same facilities are used. 92 Wn.2d at 731. According to *Keller*, the test is whether the intensified use is "different in kind" than the nonconforming use. 92 Wn.2d at 731. Although the case law is somewhat unclear, we hold that the expansion/intensification determination is a question of law. *See City of Mercer Island v. Kaltenbach*, 60 Wn.2d 105, 107,

371 P.2d 1009 (1962) (whether ordinances allow a use must be determined as a matter of law); *Meridian Minerals Co. v. King County*, 61 Wn. App. 195, 209 n.14, 810 P.2d 31 (1991) (whether a zoning code prohibits a land use is a question of law).[6]

The trial court concluded that three activities "significantly changed, altered, extended and enlarged the existing use" and therefore constituted an expansion of use: "(1) expanded hours; (2) commercial, for-profit use (including military training); [and] (3) increasing the noise levels by allowing explosive devises [sic], high caliber weaponry greater than 30 caliber and practical shooting." CP at 4075-76. We hold that the Club's increased hours did not constitute an expansion of its nonconforming use. However, we hold that the other two activities did constitute an impermissible expansion of use.

First, the trial court found that the Club currently allowed shooting between 7:00 AM and 10:00 PM, seven days a week. But the trial court found that in 1993 shooting occurred during daylight hours only, sounds of shooting could be heard primarily on the weekends and early mornings in September (hunter sight-in season), and hours of active shooting were considerably fewer than today. We hold that the increased hours of shooting range activities here do not effect a "fundamental change" in the use and do not involve a use "different in kind" than the nonconforming use. *Keller*, 92 Wn.2d at 731. Instead, the nature and character of the use has remained unchanged despite the expanded hours. By definition, this represents an intensification

---

[6] *But see Keller*, 92 Wn.2d at 732, in which our Supreme Court discusses the trial court's *finding of fact* that "intensification wrought no change in the nature or character of the nonconforming use."

of use rather than an expansion. We hold that the trial court's findings do not support a legal conclusion that the increased hours of shooting constituted an expansion of the Club's use.

Second, the trial court made unchallenged findings that from 2002 through 2010 three for-profit companies regularly provided a variety of firearms courses at the Club's property, many for active duty Navy personnel. The trial court found that one company provided training for approximately 20 people at a time over three consecutive weekdays as often as three weeks per month from 2004 through 2010. Before this time, there was no evidence of for-profit firearm training at the property. Because the training courses involved the operation of firearms, that use on one level was not different than use of the property as a gun club's shooting range. However, using the property to operate a commercial business primarily serving military personnel represented a fundamental change in use and was completely different in kind than using the property as a shooting range for Club members and the general public.

We hold that the trial court's findings support the legal conclusion that the commercial and military use of the shooting range constituted an expansion of the Club's nonconforming use.

Third, the trial court made unchallenged findings that the noise generated at the Club's property changed significantly between 1993 and the present. The trial court found:

> Shooting sounds from the Property have changed from occasional and background in nature, to clearly audible in the down range neighborhoods, and frequently loud, disruptive, pervasive, and long in duration. Rapid fire shooting sounds from the Property have become common, and the rapid-firing often goes on for hours at a time.

CP at 4073. The trial court further found that "[u]se of fully automatic weapons, and constant firing of semi-automatic weapons led several witnesses to describe their everyday lives as being

15

exposed to the 'sounds of war.' " CP at 4073. Similarly, the use of cannons and exploding targets caused loud booming sounds. By contrast, the trial court found that rapid-fire shooting, use of automatic weapons, and the use of cannons and explosives at the property occurred infrequently in the early 1990s.

The types of weapons and shooting patterns used currently do not necessarily involve a different character of use than in 1993, when similar weapons and shooting patterns were used infrequently. However, we hold that the frequent and drastically increased noise levels found to exist at the Club constituted a fundamental change in the use of the property and that this change represented a use different in kind than the Club's 1993 property use.

We hold that the trial court's findings support a conclusion that the extensive commercial and military use and dramatically increased noise levels constituted expansions of the Club's nonconforming use, which is unlawful under the common law and former KCC 17.455.060.

B.     VIOLATIONS OF LAND USE PERMITTING REQUIREMENTS

The trial court concluded that beginning in 1996, the Club violated various Code provisions by failing to obtain site development activity permits for extensive property development work – including grading, excavating, and filling – and failing to comply with the critical areas ordinance, KCC Title 19. The Club does not deny that it violated certain Code provisions for unpermitted work, nor does it claim that it ordinarily would not be subject to the permitting requirements.[7] And it is settled that nonconforming uses are subject to subsequently

---

[7] The Club argues that the provisions of the deed transferring the property from the County relieved the Club from compliance with development permitting requirements within its historical eight acres. This argument is discussed below.

enacted reasonable police power regulations unless the regulation would immediately terminate the nonconforming use. *Rhod-A-Zalea*, 136 Wn.2d at 9, 12 (holding that nonconforming use of land for peat mining facility is subject to subsequent grading permit requirement). KCC 17.530.030 states that any use in violation of Code provisions is unlawful. Accordingly, there is no dispute that the Club's unpermitted development work on the property constituted unlawful uses.

C.    PUBLIC NUISANCE

The Club argues that the trial court erred in ruling both that its shooting range activities constituted a nuisance and that it was a "public" nuisance. We disagree.

The trial court concluded that the Club's activities on the property constituted a public nuisance in three ways: "(1) ongoing noise caused by shooting activities, (2) use of explosives at the Property, and (3) the Property's ongoing operation without adequate physical facilities to confine bullets to the Property." CP at 4075. The trial court also concluded that the Club's expansion of its nonconforming use and unpermitted development activities constituted a public nuisance. More specifically, the trial court concluded that these activities constituted a public nuisance per se, a statutory public nuisance in violation of RCW 7.48.010, .120, .130, .140(1), and .140(2) and KCC 17.455.110, .530.030, and .110.515, and a common law nuisance based on noise and safety issues. We hold that the trial court's unchallenged factual findings support its conclusion that the Club's activities constituted a public nuisance.

1.    General Principles

A nuisance is a substantial and unreasonable interference with the use and enjoyment of another person's property. *Grundy v. Thurston County*, 155 Wn.2d 1, 6, 117 P.3d 1089 (2005).

Washington's nuisance law is codified in chapter 7.48 RCW. RCW 7.48.010 defines an actionable nuisance as "whatever is injurious to health . . . or offensive to the senses, . . . so as to essentially interfere with the comfortable enjoyment of the life and property." RCW 7.48.120 also defines nuisance as an "act or omission [that] either annoys, injures or endangers the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property."

The Code contains several nuisance provisions. KCC 9.56.020(10) defines nuisance similar to RCW 7.48.120. KCC 17.455.110 prohibits land uses that "produce noise, smoke, dirt, dust, odor, vibration, heat, glare, toxic gas or radiation which is materially deleterious to surrounding people, properties or uses." KCC 17.530.030 provides that "[a]ny use . . . in violation of this title is unlawful, and a public nuisance." Finally, KCC 17.110.515 states that "any violation of this title [zoning] shall constitute a nuisance per se."

If particular conduct interferes with the comfort and enjoyment of others, nuisance liability exists only when the conduct is unreasonable. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 923, 296 P.3d 860 (2013). "We determine the reasonableness of a defendant's conduct by weighing the harm to the aggrieved party against the social utility of the activity." *Lakey*, 176 Wn.2d at 923; *see also* 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 10.3, at 656-57 (2d ed. 2004) (whether a given activity is a nuisance involves balancing the rights of enjoyment and free use of land between possessors of land based on the attendant circumstances). " 'A fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance is the reasonableness or unreasonableness of conducting the business or making the use of the property

complained of in the particular locality and in the manner and under the circumstances of the case.' " *Shields v. Spokane Sch. Dist. No. 81*, 31 Wn.2d 247, 257, 196 P.2d 352, 358 (1948) (quoting 46 C.J. 655, NUISANCES, § 20). Whether a nuisance exists generally is a question of fact. *Lakey*, 176 Wn.2d at 924; *Tiegs v. Watts*, 135 Wn.2d 1, 15, 954 P.2d 877 (1998).

A nuisance per se is an activity that is not permissible under any circumstances, such as an activity forbidden by statute or ordinance. 17 STOEBUCK & WEAVER, § 10.3, at 656; *see also Tiegs*, 135 Wn.2d at 13. However, a lawful activity also can be a nuisance. *Grundy*, 155 Wn.2d at 7 n.5. "[A] lawful business is never a nuisance per se, but may become a nuisance by reason of extraneous circumstances such as being located in an inappropriate place, or conducted or kept in an improper manner." *Hardin v. Olympic Portland Cement Co.*, 89 Wash. 320, 325, 154 P. 450, 451 (1916).

2.   Excessive Noise

The Club argues that the trial court erred in ruling that noise generated from the shooting range's activities constituted a nuisance. We disagree.

a.   Unchallenged Findings of Fact

The Club does not assign error to any of the trial court's findings of fact regarding noise, but it challenges the trial court's "conclusion" that the conditions constituted a nuisance. But the trial court's determination that the conditions constituted a nuisance actually is a factual finding. *Lakey*, 176 Wn.2d at 924; *Tiegs*, 135 Wn.2d at 15. Therefore, our review is limited to determining whether the record contains substantial evidence to support the trial court's finding that the noise generated from the Club's activities was a substantial and unreasonable

19

interference with neighbors' use and enjoyment of their property. *Casterline*, 168 Wn. App. at 381.

The trial court made unchallenged findings that (1) loud rapid fire shooting occurred 7:00 AM to 10:00 PM, seven days a week; (2) the shooting sounds were "clearly audible in the down range neighborhoods, and frequently loud, disruptive, pervasive, and long in duration," CP at 4073; (3) at times, the use of fully automatic weapons or the constant firing of semi-automatic weapons made residents feel exposed to the "sounds of war," CP at 4073; (4) the Club allowed the use of exploding targets, including Tannerite and cannons, which caused loud "booming" sounds in residential neighborhoods within two miles of the Club property and caused houses to shake, CP at 4074; (5) the noise from the range interfered with the comfort and repose of nearby residents, interfered with their use and enjoyment of their property, and had increased in the past five to six years; (6) the interference was common, occurred at unacceptable hours, and was disruptive of both indoor and outdoor activities; and (7) the description of noise interference was representative of the experience of a significant number of homeowners within two miles of the Club property.

Based on these findings of fact, the trial court found that the ongoing noise caused by the shooting range – specifically the Club's hours of operation, caliber of weapons allowed to be used, use of exploding targets and cannons, hours and frequency of "practical shooting," and automatic weapons use – was substantial and unreasonable, and therefore constituted common law public nuisance and statutory public nuisance conditions under RCW 7.48.120, KCC 17.530.030, and KCC 17.110.515. CP at 4078. The undisputed facts were sufficient to support this finding.

The trial court heard testimony, considered the evidence, and found that the noise was significant, frequent, and disruptive, and that it interfered with the surrounding property's use and enjoyment. The record contains substantial evidence to support these findings. Accordingly, we hold that the trial court did not err in finding that excessive noise from the Club's activities constituted a nuisance.

### b. Noise Ordinances

The Club argues that despite the trial court's factual findings, noise from its activities cannot constitute a nuisance because the County failed to present evidence that it violated state and County noise ordinances and provided no objective measurement of noise. We disagree.

Although WAC 173-60-040 provides maximum noise levels, related regulations generally defer to local governments to regulate noise. *See* WAC 173-60-060, -110. Chapter 10.28 KCC provides maximum permissible environmental noise levels for the various land use zones. KCC 10.28.030-.040. But a violation may occur without noise measurements being made. KCC 10.28.010(b), .130. KCC 10.28.145 also prohibits a "public disturbance" noise.

The Club cites no Washington authority for the proposition that noise cannot constitute a nuisance unless it violates applicable noise regulations and Code provisions. None of the nuisance statutes or Code provisions require that a nuisance arise from a statutory or regulatory violation. A nuisance exists if there has been a substantial and unreasonable interference with the use and enjoyment of property. *Grundy*, 155 Wn.2d at 6. The trial court's unchallenged findings of fact support a determination that noise the Club generates constitutes a nuisance regardless of whether the noise level exceeds the specified decibel level.

c.   Noise Exemption for Shooting Ranges

The Club argues that noise from the shooting range cannot constitute a nuisance as a matter of law because noise regulations exempt shooting ranges. Because this argument presents a legal issue, we review it de novo. *Recreational Equip.*, 165 Wn. App. at 559. We disagree with the Club.

Sounds created by firearm discharges on authorized shooting ranges are exempt from KCC 10.28.040 (maximum permissible environmental noise levels) and KCC 10.28.145 (public disturbance noises) between the hours of 7:00 AM and 10:00 PM. KCC 10.28.050. The Washington Department of Ecology also exempts sounds created by firearms discharged on authorized shooting ranges from its maximum noise level regulations. RCW 70.107.080; WAC 173-60-050(1)(b). The Code broadly defines "firearm" as "any weapon or device by whatever name known which will or is designed to expel a projectile by the action of an explosion," including rifles, pistols, shotguns, and machine guns. KCC 10.24.080. As a result, the noise from the weapons being fired at the Club's range falls within the noise exemption provisions of KCC 10.28.050, and thus is exempt from the maximum permissible environmental noise levels and public disturbance noise restrictions.[8]

But once again, the Club cites no authority for the proposition that an exemption from noise ordinances affects the determination of whether noise constitutes a nuisance. Because a nuisance can be found even if there is no violation of noise ordinances, the exemption from such ordinances is immaterial.

---

[8] However, the noise from the use of exploding targets, including Tannerite targets, is not noise from the discharge of firearms and therefore is not exempt from the noise ordinances.

22

The Club also argues that the exemption of shooting range noise from the state and local noise ordinances should be considered an express authority to make that noise. This argument is based on RCW 7.48.160, which provides that nothing done or maintained under the express authority of a statute can be deemed a nuisance.

Our Supreme Court addressed a similar issue in *Grundy*. In that case, a private person brought a public nuisance claim against Thurston County and a private nuisance claim against her neighbor for raising his seawall which left her property vulnerable to flooding. *Grundy*, 155 Wn.2d at 4-5. The public nuisance claim was based on assertions that Thurston County had wrongfully and illegally allowed the project by deciding that the seawall qualified for an administrative exemption from substantial permitting requirements. *Grundy*, 155 Wn.2d at 4-5. Rather than challenge Thurston County's administrative decision, the objecting neighbor sought to abate the seawall as a nuisance. *Grundy*, 155 Wn.2d at 4-5. Although the Supreme Court did not reach the public nuisance issue, it disagreed with the Court of Appeals' suggestion that the public nuisance was foreclosed based on the rule that nothing which is done or maintained under the express authority of a statute can be deemed a nuisance. *Grundy*, 155 Wn.2d at 7 n.5. The Supreme Court stated that a lawful action may still be a nuisance based on the unreasonableness of the locality, manner of use, and circumstances of the case. *Grundy*, 155 Wn.2d at 7 n.5.

We interpret RCW 7.48.160 as requiring a direct authorization of action to escape the possibility of nuisance. *See Judd v. Bernard*, 49 Wn.2d 619, 621, 304 P.2d 1046 (1956) (State's eradication of fish in lake is not a nuisance because a statute authorizes the fish and wildlife department to remove or kill fish for game management purposes). There is no such direct

23

authorization here. We hold that the noise exemption and RCW 7.48.160 do not foreclose the County's nuisance claim based on noise.

Finally, the Club argues that even if the noise exemption does not automatically determine whether a nuisance exists, the noise statutes and ordinances (including the shooting range exemption) portray the community standards. The Club claims that the exemption reflects the community's decision that authorized shooting range sounds during designated hours are not unreasonable. Regulations affecting land use may be relevant in "determining whether one property owner has a reasonable expectation to be free of a particular interference resulting from use of neighboring property." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 3.13, at 150 (4th ed. 2013). But the shooting range exemption is merely one factor to consider in determining the reasonableness of the Club's activities. The exemption does not undermine the trial court's findings that the Club's activities constituted a nuisance.

We hold that the trial court's unchallenged factual findings supported its determination that the noise generated from the Club's activities constituted a statutory and common law nuisance.

3. Safety Issues

The Club argues that the trial court erred in ruling that safety issues associated with the shooting range's activities constituted a nuisance. We disagree because the trial court's unchallenged factual findings support its ruling.

24

a.    Unchallenged Findings of Fact

The Club did not assign error to any of the trial court's findings of fact regarding safety, but it challenges the trial court's "conclusion" that the conditions constituted a nuisance. However, as discussed above regarding noise, the trial court's determination that the unsafe conditions constituted a nuisance actually is a factual finding. *Lakey*, 176 Wn.2d at 924; *Tiegs*, 135 Wn.2d at 15. Therefore, once again our review is limited to determining whether the record contains substantial evidence to support the trial court's finding that safety issues arising from the Club's activities were a substantial and unreasonable interference with neighbors' use and enjoyment of their property. *Casterline*, 168 Wn. App. at 381.

The trial court made unchallenged findings that (1) the Club's property was a "blue sky" range, with no overhead baffles to stop accidently or negligently discharged bullets, CP at 4070; (2) more likely than not, bullets have escaped and will escape the Club's shooting areas and possibly will strike persons or property in the future based on the firearms used at the range, vulnerabilities of neighboring residential property, allegations of bullet impacts in nearby residential developments, evidence of bullets lodged in trees above berms, and the opinions of testifying experts; and (3) the Club's range facilities, including safety protocols, were inadequate to prevent bullets from leaving the property.

Based on these findings of fact, the trial court determined that the ongoing operation of the range without adequate physical facilities to confine bullets to the property creates an ongoing risk of bullets escaping the property to injure persons and property and constitutes a public nuisance under RCW 7.48.120, KCC 17.530.030, and KCC 17.110.515. The undisputed facts were sufficient to support a finding that the safety issues arising from the Club's activities

were unreasonable and constituted a "substantial and unreasonable interference" with the surrounding property's use and enjoyment. *Grundy*, 155 Wn.2d at 6.

The trial court heard testimony, considered the evidence, and found that the safety issues were significant and interfered with the surrounding property's use and enjoyment. Accordingly, we hold that the evidence was sufficient to support the trial court's determination that safety issues from the Club's activities created a nuisance.

> b.   Probability of Harm

The Club also argues that the trial court's findings do not support its conclusion that the range is a safety nuisance because the trial court did not find that any bullet from the Club had ever struck a person or nearby property. Similarly, the Club points out that the trial court found only that it was possible, not probable, that bullets could strike persons or property, and argues that the mere possibility of harm cannot constitute a safety nuisance. We disagree.

The Club provides no authority that a finding of actual harm is necessary to support a determination that an activity constitutes a safety nuisance. And contrary to the Club's argument, nuisance can be based on a reasonable fear of harm. "Where a defendant's conduct causes a reasonable fear of using property, this constitutes an injury taking the form of an interference with property." *Lakey*, 176 Wn.2d at 923. "[T]his fear need not be scientifically founded, so long as it is not unreasonable." *Lakey*, 176 Wn.2d at 923.

In *Everett v. Paschall*, our Supreme Court enjoined as a nuisance a tuberculosis sanitarium maintained in a residential section of the city where the reasonable fear and dread of the disease was such that it depreciated the value of the adjacent property, disturbed the minds of residents, and interfered with the residents' comfortable enjoyment of their property despite that

the sanitarium imposed no real danger. 61 Wash. 47, 50-53, 111 P. 879 (1910). And in *Ferry v. City of Seattle*, the Supreme Court affirmed the trial court's decision to enjoin as a nuisance the erection of a water storage reservoir in a city park due to residents' very real and present apprehension that it may collapse and flood the neighborhood damaging property and imperiling residents. 116 Wash. 648, 662-63, 666, 203 P. 40 (1922). The court held that "the question of the reasonableness of the apprehension turns again, not only on the probable breaking of the reservoir, but the realization of the extent of the injury which would certainly ensue; that is to say the court will look to consequences in determining whether the fear existing is reasonable." *Ferry*, 116 Wash. at 662.

In any event, whether an activity causes actual or threatened harm or a reasonable fear is not the dispositive issue. The crucial question for nuisance liability is whether the challenged activities are reasonable when weighing the harm to the aggrieved party against the social utility of the activity. *Lakey*, 176 Wn.2d at 923. For instance, in *Lakey*, neighbors of Puget Sound Energy (PSE) alleged that the electromagnetic fields (EMFs) emanating from its substation constituted a private and public nuisance. 176 Wn.2d at 914. Our Supreme Court concluded that even though the neighbors had demonstrated reasonable fear from EMF exposure, as a matter of law PSE's operation of the substation was reasonable based on weighing the harm against the social utility. *Lakey*, 176 Wn.2d at 923-25.

Here, the trial court found after weighing extensive evidence that the Club's range facilities and safety protocols were inadequate to prevent bullets from leaving the property and that more likely than not bullets will escape the Club's shooting areas. The trial court also found that the Club's property was close to "numerous residential properties and civilian populations."

27

CP at 4078. These undisputed facts support the trial court's determination that the Club's shooting activities created a risk of property damage and personal injury to neighboring residents, and therefore were unreasonable under the circumstances.

The trial court's unchallenged factual findings support its implicit conclusion that the Club's activities were unreasonable with respect to safety issues. We hold that the trial court's factual findings supported its determination that the safety issues arising from the Club's activities constituted a statutory and common law nuisance.

4. Expansion of Use/Unpermitted Development

The Club does not directly challenge the trial court's ruling that the Club's unlawful expansion of its nonconforming use and violation of various Code provisions represented a public nuisance. KCC 17.110.515 provides that "any violation of this title shall constitute a nuisance, per se." KCC 17.530.030 provides that "any use . . . in violation of this title is unlawful, and a public nuisance." We held above that the Club's expansion of its nonconforming use violated former KCC 17.455.060. Similarly, the Club's unpermitted development work violated Code provisions. *See, e.g.*, KCC 12.10.030 (activities requiring site development activity permits). Accordingly, it is undisputed that the Club's use expansion and unpermitted development work at the property constituted a nuisance as a matter of law.

5. Existence of a Public Nuisance

The County brought this action against the Club on behalf of the public. As a result, in order to prevail the County must show not only that the Club's activities constitute a nuisance, but that they constitute a *public* nuisance. The Club argues that the trial court erred in determining that the Club's activities constituted a public nuisance. We disagree.

28

RCW 7.48.130 provides that a public nuisance is one that "affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." An example of a public nuisance was presented in *Miotke v. City of Spokane*, where the city of Spokane discharged raw sewage into the Spokane River. 101 Wn.2d 307, 309, 678 P.2d 803 (1984). The plaintiffs were the owners of lakefront properties below a dam on the river. *Miotke*, 101 Wn.2d at 310. The court held that the release constituted a public nuisance because it affected the rights of all members of the community living along the lake shore. *Miotke*, 101 Wn.2d at 331.

### a. Excessive Noise

The trial court made no express ruling that the excessive noise from the Club's activities affected equally the rights of an entire community. But the trial court made a finding accepting as persuasive the testimony of current and former neighbors who described noise conditions that "interfere[d] with the comfort and repose of residents and their use and enjoyment of their real properties" and who "describe[ed] their everyday lives as being exposed to the 'sounds of war.' " CP at 4073. The trial court also found that "[t]he testimony of County witnesses who are current or former neighbors and down range residents is representative of the experience of a significant number of home owners within two miles of the [Club's] Property." CP at 4073. This finding implicitly identifies the relevant "community" as the area within two miles of the Club. Finally, the trial court cited to RCW 7.48.130 (and other nuisance statutes) in entering a conclusion of law stating that the Club's property "has become and remains a place violating the comfort, repose, health and safety *of the entire community or neighborhood.*" CP at 4078. (Emphasis added.)

29

The Club argues that the noise conditions are not a public nuisance because the evidence shows that noise from the Club does not affect the rights of all members of the community equally. The Club points to testimony from witnesses that stated that the noise from the Club did not disturb them. However, every neighbor testifying discussed the noise caused by the Club, which the trial court found affected all property within a two mile radius of the Club. In this respect, the facts here are similar to those in *Miotke*, where the pollutants affected every lakefront property owner. The fact that some residents were not much *bothered* by the noise does not defeat the public nuisance claim because it relates to the extent of damage caused by the condition, which need not be equal.

We hold that the trial court's unchallenged factual findings support its determination that noise from the Club constituted a public nuisance.

b. Safety Issues

Regarding safety, the trial court entered findings referencing the testimony of range safety experts and finding that "more likely than not, bullets will escape the Property's shooting areas and will possibly strike persons or damage private property in the future." CP at 4070. The trial court also found that the Club's facilities were inadequate to contain bullets inside the property. However, once again the trial court made no factual findings regarding safety that specifically addressed the public nuisance question.

The Club argues that fear of bullets leaving the Club's property does not equally affect all members of the community. As with the noise, the Club argues that some witnesses testified that they were not afraid of the Club. However, the trial court cited to RCW 7.48.130 in stating that the Club's property "has become and remains a place violating the . . . safety of the *entire*

30

community or neighborhood." CP at 4078 (Emphasis added.) And the trial court's finding that it was likely that bullets would escape the shooting areas and possibly cause injury or damage supports a conclusion that the risk of injury or damage is equal in all areas where bullets might escape. Although the trial court did not address the exact parameters of the affected area, the failure to identify the applicable community does not preclude a public nuisance finding.

We hold that the trial court's unchallenged factual findings support its determination that safety issues constituted a public nuisance.

c. Expansion of Use/Unpermitted Development

As noted above, KCC 17.530.030 provides that any use in violation of the zoning ordinances is a public nuisance, and KCC 12.32.010 provides that violation of certain permitting requirements is a public nuisance. This is consistent with the principle that one type of public nuisance involves an activity that is forbidden by statute or ordinance. 17 STOEBUCK & WEAVER, § 10.3, at 663. As a result, the trial court ruled that the Club's unpermitted development work constituted a public nuisance.

The Club does not directly challenge the trial court's finding of a public nuisance on this basis. Because the Club's expansion of use and unpermitted development work violated various Code provisions, it is undisputed that the Club's unpermitted development work constituted a public nuisance.

D. EFFECT OF DEED OF SALE

The Club argues that even if its activities were unlawful as discussed above, the language of the deed of sale transferring the property title from the County to the Club prevents the County from challenging any part of the Club's status or operation as it existed in 2009,

31

including expansion of its nonconforming use status, permitting violations, and nuisance activities. According to the Club, the deed represented a settlement of any potential disputes regarding the Club's nonconforming use, including any Code violations, and was an affirmation that the Club may operate as it then existed and improve its facilities within the historical eight acres. The Club argues that this settlement is enforceable as an accord and satisfaction affirmative defense or a breach of contract counterclaim. The Club also argues that the deed provisions and extrinsic evidence estop the County from attempting to terminate the Club's nonconforming use or denying that the Club's then-existing facilities and operations were not in violation of the Code or a public nuisance.

The trial court ruled that the deed did not prevent or estop the County from challenging the Club's unlawful uses of its property. We agree with the trial court.

1.    Standard of Review

Interpretation of a deed is a mixed question of fact and law. *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 459 n.7, 243 P.3d 521 (2010). Our goal is to discover and give effect to the parties' intent as expressed in the deed. *Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 745, 844 P.2d 1006 (1993). The parties' intent is a question of fact and the legal consequence of that intent is a question of law. *Affiliated FM Ins.*, 170 Wn.2d at 459 n.7. We defer to the trial court's factual findings if they are supported by substantial evidence and review questions of law and conclusions of law de novo. *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw. Inc.*, 168 Wn. App. 56, 64, 277 P.3d 18 (2012); *Casterline*, 168 Wn. App. at 381.

32

2.  Accord and Satisfaction Defense/Breach of Contract Counterclaim

The Club argues that the trial court erred in failing to interpret the deed as incorporating a covenant by the County to allow the Club to continue the shooting range as it then existed, enforceable under contract law, or as a settlement of potential land use disputes under principles of accord and satisfaction.[9] The Club relies on (1) deed clauses providing for improvement and expansion of the shooting range, (2) a claimed implied duty to allow the Club to perform the deed's public access clause, (3) a claimed implied duty not to frustrate the purpose of the deed – for the Club to continue operating the shooting range, and (4) extrinsic evidence that allegedly confirms the Club's interpretation of the parties' intent. We disagree with the Club.

a.  Improvement and Expansion Clauses

The deed addresses improvement and expansion of the shooting range. The Club refers to the "improvement clause," which provides:

> [The Club] shall confine its active shooting range facilities on the property consistent with its historical use of approximately eight (8) acres of active shooting ranges with the balance of the property serving as safety and noise buffer zones; provided that [the Club] may upgrade or improve the property and/ or facilities within the historical approximately eight (8) acres in a manner consistent with "modernizing" the facilities consistent with management practices for a modern shooting range.

CP at 4088. The deed also contains an "expansion clause," which states that "[the Club] may also apply to Kitsap County for expansion beyond the historical eight (8) acres, for 'supporting' facilities for the shooting ranges or additional recreational or shooting facilities, provided that

---

[9] The Club also argues that the deed guaranteed its right to continue operating as a nonconforming shooting range as it existed at the time of the deed. Because we hold below that the Club's unlawful property use does not terminate its nonconforming use status, we need not address this issue.

33

said expansion is consistent with public safety, and conforms with the terms and conditions [in this deed] . . . and the rules and regulations of Kitsap County for development of private land." CP at 4088.

The Club argues that the juxtaposition of the improvement clause and the expansion clause (which requires an application and compliance with rules and regulations) means that improvements within the historical eight acres are allowed uses and do not need to comply with county development regulations. We disagree.

First, the improvement clause makes no reference to the Club's existing use, except to limit the Club's use to eight acres. Specifically, the clause says nothing about the lawfulness of the Club's existing use, the County's position regarding that use, or the settlement of any potential land use disputes.

Second, the language regarding improvements refers only to future modernization. The clause does not ratify unpermitted development activities that occurred in the past. Even if the two clauses could be interpreted as waiving any Code requirements for future work, the deed by its clear language does not apply to past work. And most of the development work the trial court referenced in its decision took place before the deed's execution.

Third, the deed states that the conveyance of land is made subject to certain covenants and conditions, "the benefits of which shall inure to the benefit of the public and the burdens of which shall bind the [Club]." CP at 4087. The improvement clause is one such restrictive covenant: it restricts the Club's property use to its active shooting range facilities consistent with its eight acres of historical use and then makes an exception for certain improvements within the eight acres and further expansion by application. It would be unreasonable to view a restrictive

34

covenant in the deed as an affirmative ratification of past development and a waiver of future development permitting violations. Accordingly, we reject the Club's argument that the improvement and expansion clauses preclude the County from challenging the Club's shooting range activities.

b. Public Access Clause

The deed provides that access by the public to the Club's property must be offered at reasonable prices and on a nondiscriminatory basis. The Club argues that the trial court erred in "failing to give effect to the County's implied duty to allow the Club to perform the public access provision in the [d]eed." Br. of Appellant at 43. The Club states that it was depending on the County's approval of its then-existing facilities and operations when it agreed to provide public access. The Club also claims that the County's attempt to shut down the shooting range would prevent the Club from performing its side of the contract. We disagree.

The language in the public access clause does not restrict the County from enforcing zoning regulations or seeking to abate nuisance conditions on the conveyed property. And the Club has cited no authority for the proposition that its agreement to provide public access somehow prevents the County from taking actions that would limit Club activities. Accordingly, we reject the Club's argument that the public access clause precludes the County from challenging the Club's shooting range activities.[10]

---

[10] Because we hold below that terminating the Club's nonconforming use is not an appropriate remedy for the Club's unlawful activities, we need not address whether the public access clause would prevent the County from shutting down the Club.

35

c.   Implied Duty Regarding Frustration of Purpose

The Club contends that the trial court erred in "failing to give effect to the County's implied duty not to frustrate the [d]eed's purpose of allowing the Club to continue operating its nonconforming shooting range as it existed within the historical eight acres of active use." Br. of Appellant at 45. The Club argues that the deed expressed the understanding that the Club was purchasing the property for that purpose and that as the grantor/seller, the County implied that what was sold was suitable for that purpose and bore the risk if it was not. We disagree.

Under the Code, the Club did have the right to continue its nonconforming use. KCC 17.460.020. But the County's lawsuit alleged that the Club had expanded outside its nonconforming use right, developed the land without proper permits, and operated the range in a manner that constituted a nuisance. Those alleged conditions are all within the Club's control. The County's sale of the land even for the purpose of facilitating the Club's continued existence does not prevent the County from insisting that it be operated in a manner consistent with the law. We reject the Club's argument.

d.   Extrinsic Evidence

The Club argues that extrinsic evidence demonstrated that the County intended to resolve all land use issues at the Club's property by the terms of the deed. The Club claims that (1) the County's statements in conjunction with the deed were an expression of its intent to approve and ratify any potentially actionable existing conditions on the property, and (2) the County's knowledge of potential issues involving the Club shows that the County intended to settle or waive those issues with the deed. We hold that the record supports the trial court's factual findings.

36

The Club relies on four pieces of extrinsic evidence. First, the minutes and recordings of the Board's meeting include statements by a county official and two county commissioners in support of the land sale so that its existing use as a shooting range may continue. Second, a Board resolution supported the Club's continued shooting range operation and stated that it is "in the best economic interest of the County to provide that [the Club] continue to operate with full control over the property on which it is located." CP at 858. Third, a letter from one of the county commissioners entered into the public record stated that the Board earlier had assured a state agency (that was considering providing grant funds to the Club), that the "[Club] and its improvements were not at odds with the County's long-term interest in the property." CP at 3793. Fourth, the evidence shows that at the time the deed was executed the County was aware of possible existing permitting violations, unlawful expansion, and complaints from neighbors about the Club.

However, the trial court's findings show that it considered this evidence and concluded that the evidence did not support the Club's arguments. The Club argues that the trial court erroneously found that "[t]he only evidence produced at trial to discern the County's intent at the time of the 2009 Bargain and Sale Deed was the deed itself," CP 4058, because the Club produced substantial evidence bearing on the County's intent and the trial court failed to consider it. But we interpret the court's factual finding to mean that the trial court considered the deed as the only *credible* evidence of the County's intent. The finding cannot be read to mean that the deed was the only evidence produced because it is clear that the trial court did consider other evidence bearing on the parties' intent.

37

After considering the extrinsic evidence, the trial court found that (1) the Board's minutes and recordings do not reveal an intent to settle disputed claims or land use decisions or land use status at the property, and (2) the parties did not negotiate for the resolution of potential civil violations of the Code at the property or to resolve the property's land use status.[11] The trial court also made an *unchallenged* factual finding that the deed does not identify or address any then-existing disputes between the Club and County. The Club disagrees with these findings, but the weight given to certain evidence is within the trial court's discretion.

In essence, the Club is asking us to substitute our view of the evidence for the trial court's findings. That is not our role.

> [W]here a trial court finds that evidence is insufficient to persuade it that something occurred, an appellate court is simply not permitted to reweigh the evidence and come to a contrary finding. It invades the province of the trial court for an appellate court to find compelling that which the trial court found unpersuasive. Yet, that is what appellant wants this court to do. There was conflicting evidence in this case. The trial judge weighed that conflicting evidence and chose which of it to believe. That is the end of the story.

*Bale v. Allison*, 173 Wn. App. 435, 458, 294 P.3d 789 (2013) (quoting *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009)) (emphasis omitted). Accordingly, we reject the Club's argument that extrinsic evidence supports its interpretation of the deed language.

---

[11] The County argues that these findings of fact should be treated as verities because the Club did not assign error to them in its initial brief and fails to assign error to the trial court's failure to adopt any of its proposed findings. RAP 10.3(g), 10.4. However, the County acknowledges and responds to the findings of fact that the Club disputes in the body of its brief – findings 23, 35, 26, and 57. Although the Club violated RAP 10.3(g), we exercise our discretion to waive the Club's failure to strictly comply with the procedural rules. *See In re Disciplinary Proceedings Against Conteh*, 175 Wn.2d 134, 144, 284 P.3d 724 (2012).

3. Estoppel Defense

The Club assigns error to the trial court's denial of its equitable estoppel defense. Apparently the Club contends that the County is estopped from asserting all of its claims. We need not decide whether the County should be estopped from seeking termination of the Club's nonconforming use because we hold below that termination is not an appropriate remedy for the Club's allegedly prohibited activities. But we disagree that estoppel applies to the County's other claims.

Equitable estoppel against a governmental entity requires a party to prove five elements by clear and convincing evidence:

> (1) a statement, admission, or act by the party to be estopped, which is inconsistent with its later claims; (2) the asserting party acted in reliance upon the statement or action; (3) injury would result to the asserting party if the other party were allowed to repudiate its prior statement or action; (4) estoppel is 'necessary to prevent a manifest injustice'; and (5) estoppel will not impair governmental functions.

*Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 887, 154 P.3d 891 (2007) (quoting *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993)). Whether equitable relief is appropriate is a question of law. *Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365, 374, 113 P.3d 463 (2005).

The Club's estoppel defense is not viable because the County's enforcement of its Code and nuisance law is not inconsistent with its earlier position. The County's general support for the shooting range's continued existence is not inconsistent with its current insistence that the range conform to development permitting requirements and operate in a manner not constituting a nuisance. Moreover, the County's enforcement of its zoning code and nuisance law is a government function. *See City of Mercer Island v. Steinmann*, 9 Wn. App. 479, 482, 513 P.2d

39

80 (1973). If the County was estopped from enforcing those laws, it would certainly impair governmental functions. Finally, estoppel is not required to prevent manifest injustice here, especially because the Club's allegation of the County's inconsistency is tenuous.

The Club has failed to prove the essential elements of estoppel. We hold that the trial court did not err in rejecting the Club's estoppel defense.

*REMEDY FOR THE CLUB'S UNLAWFUL USE*

A.    TERMINATION OF NONCONFORMING USE

The Club argues that the trial court erred in concluding that an unlawful expansion of the Club's nonconforming use, unpermitted development activities, and public nuisance activities terminated the Club's legal nonconforming use of the property as a shooting range. As a result, the Club argues that the trial court erred in issuing a permanent injunction shutting down the shooting range until the Club obtains a conditional use permit. We agree, and hold that the termination of the Club's nonconforming use is not the appropriate remedy for its unlawful uses.

1.    Standard of Review

Injunctive relief is an equitable remedy, and we review a trial court's decision to grant an injunction and the terms of that injunction for an abuse of discretion. *Early Dawn Estates*, 173 Wn. App. at 789. However, whether termination of a property's nonconforming use is an appropriate remedy for unlawful uses of that property is a question of law, which we review de novo. *See King County DDES*, 177 Wn.2d at 643 (reiterating that legal questions "are reviewed de novo."). If termination of the nonconforming use is an appropriate remedy as a matter of law, we apply the abuse of discretion standard in reviewing the trial court's decision to select that remedy.

2. Kitsap County Code

The KCC chapter on nonconforming uses, KCC 17.460.010, allows nonconforming uses to continue until they are removed or discontinued. KCC 17.460.020 further states that a nonconforming use may be continued as long as it is "otherwise lawful." The County argues that this ordinance allows termination of the Club's operation as a shooting range because the Club's unlawful expansion, permitting violations, and/or nuisance prevents the nonconforming use from being "otherwise lawful." We disagree with the County's interpretation of the Code.

First, based on the plain language of the Code it is the nonconforming *use* that must remain lawful. KCC 17.460.020. A "use" of land means "the nature of occupancy, type of activity or character and form of improvements to which land is devoted." KCC 17.110.730. The Club's use of the property is as a shooting range. Therefore, the question under KCC 17.460.020 is whether a *shooting range* is a lawful use of the Club's property (other than the fact it does not conform to zoning regulations), not whether specific activities at the range are unlawful. For instance, termination of the Club's nonconforming use may be an appropriate remedy under KCC 17.460.020 if that use would not be allowed to continue under any circumstances, such as if the County or the State passed a law prohibiting all shooting ranges. But here the use of the Club's property as a shooting range remains lawful, and therefore any unlawful expansion of use, permitting violations, or nuisance activities cannot trigger termination of the otherwise lawful nonconforming use.

Second, the penalty and enforcement provisions of the Code do not support a termination remedy. KCC 17.530.020, which is a section entitled "penalties" in the enforcement chapter of the zoning title, provides that violation of any provision of the zoning title constitutes a civil

41

infraction and that the County may seek civil penalties. There is no mention of forced termination of an existing nonconforming use based on a Code violation. And the Code expressly provides for a less drastic remedy. KCC 17.530.050, which also is within the enforcement chapter, provides that "the director may accept a written assurance of discontinuance of any act in violation of this title from any person who has engaged in such act." In support of this position, we note that the County's chief building official Jeffrey Rowe testified that the Code allows a landowner to get back into conformity by retracing a prohibited expansion, enlargement, or change of use.

Specifically regarding nuisance, KCC 17.530.030 provides that any person may bring an action to abate a nuisance. But there is no authority supporting a proposition that an activity on property that constitutes a nuisance operates to terminate that property's nonconforming use status.

Third, the County's interpretation allowing any expansion of use, permitting violation, or nuisance activity to terminate a nonconforming use would eviscerate the value and protection provided by a legal nonconforming use. Nonconforming use status would have little value if an expansion of that use would prevent the owner from continuing the lawful use in place before the expansion. And this would be contrary to the Code's stated purpose in KCC 17.460.010: to permit nonconforming uses to continue.

We hold that the Code does not provide for a termination remedy for Code violations or unlawful expansion of nonconforming uses.

2.   Common Law

The common law also does not support the trial court's remedy. We have found no Washington case holding that an unlawful expansion of a nonconforming use, permitting violations, or nuisance activities terminates a nonconforming use. Further, no Washington case has even suggested such a remedy. In *Keller*, the plaintiffs challenged as unlawful the enlargement of a chlorine manufacturing facility that was a nonconforming use. 92 Wn.2d at 728-29. Although the Supreme Court did not specifically address the remedy for an unlawful expansion, it gave no indication that the entire facility could be shut down if the enlargement constituted an unlawful expansion.

Courts in other jurisdictions have concluded that in the absence of statutory authority, an unlawful expansion of a nonconforming use does not operate to terminate that use. *Dierberg v. Bd. of Zoning Adjustment of St. Charles County*, 869 S.W.2d 865, 870 (Mo. App. 1994); *Garcia v. Holze*, 94 A.D.2d 759, 462 N.Y.S.2d 700, 703 (1983). Instead, the remedy is to discontinue the activities that exceed the lawful nonconforming use. *See Dierberg*, 869 S.W.2d at 870.

Similarly, no Washington court has held that permitting violations associated with a nonconforming use terminates that use. In *Rhod-A-Zalea*, the Supreme Court held that the owner of a peat mine operated as a nonconforming use had violated permitting requirements for grading activities. 136 Wn. 2d at 19-20. Again the court did not specifically address the remedy for this violation, but did not even suggest that the failure to obtain required permits would allow termination of the mining operation.

And no Washington court has held that nuisance activities associated with a nonconforming use terminate that use. Historically, public nuisances were prosecuted only

43

criminally (fine or jail time), but in more modern times legislators have enacted measures emphasizing abatement of the nuisance over assessing criminal penalties. 8 THOMPSON ON REAL PROPERTY, SECOND THOMAS EDITION § 73.08(d), at 479-80 (David A. Thomas ed. 2013). *See also* RCW 7.48.200 (providing that "[t]he remedies against a public nuisance are: Indictment or information, a civil action, or abatement").

3. Appropriate Remedy

We hold that termination of the Club's nonconforming use status is not the proper remedy even though the Club did expand its use, engage in unpermitted development activities, and engage in activities that constitute a nuisance. Neither the Code nor Washington authority supports this remedy, and such a remedy would impermissibly interfere with legal nonconforming uses.

In order to implement its conclusion that the Club's nonconforming use had terminated, the trial court issued an injunction enjoining the Club from operating a shooting range on its property until it obtained a conditional use permit for a private recreational facility or some other authorized use. We vacate this injunction because it is based on an incorrect conclusion that the nonconforming use was terminated.

The appropriate remedy for the Club's expansion of its nonconforming use must reflect the fact that some change in use – "intensification" – is allowed and only "expansion" is unlawful. For the permitting violations, the Code provides the appropriate remedies for the Club's permitting violations. *See* KCC 12.32.010, .040, .050; KCC 19.100.165. We address the appropriate remedy for public nuisance in the section below.

We remand to the trial court to determine the appropriate remedies for the Club's expansion of its nonconforming use and the Club's permitting violations.

B.    REMEDY FOR PUBLIC NUISANCE

The trial court issued a second permanent injunction designed to abate the public nuisance conditions at the Club's property, which prohibited the use of fully automatic firearms, rifles of greater than nominal .30 caliber, exploding targets and cannons, and use of the property as an outdoor shooting range before 9:00 AM or after 7:00 PM. The Club argues that the court erred in entering the injunction because the activities enjoined do not necessarily constitute a nuisance, and therefore the injunction represents the trial court's arbitrary opinions regarding how a shooting range should be operated. We disagree.

The trial court had the legal authority to enter an injunction designed to abate a public nuisance under both RCW 7.48.200 and KCC 17.530.030. Therefore, the only issue is whether the terms of the injunction were appropriate. Injunctive relief is an equitable remedy, and we review a trial court's decision to grant an injunction and the terms of that injunction for an abuse of discretion. *Early Dawn Estates*, 173 Wn. App. at 789. An abuse of discretion occurs when the trial court's decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *Recreational Equip.*, 165 Wn. App. at 559. We will not reweigh the trial court's equitable considerations. *Recreational Equip.*, 165 Wn. App. at 565.

Here, the trial court's findings are supported by substantial evidence and those findings support its discretionary determination that it should grant equitable relief. Therefore, we hold that the trial court did not abuse its discretion in issuing this injunction as a remedy for the Club's

nuisance activities. The limitation of the activities is reasonably related to the noise-related nuisance and possibly to the safety-related nuisance.

The trial court also issued a warrant of abatement, with terms to be determined at a later hearing. The Club argues that this warrant of abatement was issued in error because it fails to set forth the conditions of abatement. However, the trial court had statutory authority to issue the warrant of abatement, and under the circumstances it was not inappropriate to defer entry of specific details.

*ISSUES RAISED ONLY BY AMICUS BRIEFS*

Two amicus briefs raise additional arguments against terminating the Club's nonconforming use right. The Kitsap County Alliance of Property Owners argues that substantive due process rights prevents the Code from being interpreted to terminate the Club's nonconforming use right. And the National Rifle Association argues that such a remedy violates the Second Amendment. Neither of these issues was raised at the trial court or in the parties' appellate briefs.

We do not need to consider the arguments raised solely by amici. *See, e.g., State v. Hirschfelder*, 170 Wn.2d 536, 552, 242 P.3d 876 (2010) (courts "need not address issues raised only by amici"); *State v. Jorden*, 160 Wn.2d 121, 128 n.5, 156 P.3d 893 (2007) (court is "not bound to consider argument raised only by amici"). Moreover, because we hold that termination of the Club's nonconforming right was error, there is no need to consider these constitutional arguments. We refrain from deciding constitutional issues if the case can be decided on non-constitutional grounds. *Isla Verde Int'l. Holdings, Inc., v. City of Camas*, 146 Wn.2d 740, 752, 49 P.3d 867 (2002).

*CONCLUSION*

We affirm the trial court's rulings that (1) the Club's commercial use of the property and dramatically increased noise levels constitute an impermissible expansion of its nonconforming use; (2) the Club's development work unlawfully violated various County land use permitting requirements; and (3) the excessive noise, unsafe conditions, and unpermitted development work constituted a public nuisance. We reverse the trial court's ruling that increased hours of operation constitute an expansion of its nonconforming use.

Regarding the remedy for the Club's unlawful activities, we reverse the trial court's ruling that termination of the Club's nonconforming use status as a shooting range is a proper remedy. We vacate the trial court's injunction enjoining the property's use as a shooting range. But we affirm the trial court's injunction limiting certain activities at the Club in order to abate the Club's nuisance activities. We remand for the trial court to determine the appropriate remedy for the Club's expansion of its nonconforming use and permitting violations.

MAXA, J.

We concur:

JOHANSON, C.J.

MELNICK, J.

47