# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GENE BUSROE and SUE BUSROE, husband and wife, | No. 74212-4-I |
| Appellants, | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| DREAMERS ROD, CUSTOM & PICK-UPS N.W., INC., | |
| Respondents. | FILED: January 17, 2017 |

LEACH, J. — Gene Busroe appeals the dismissal of his lawsuit against a business that did some restoration work on his classic pickup truck. Because substantial evidence supports the trial court's challenged findings of fact and those findings support its conclusions of law, we affirm.

## FACTS

According to unchallenged findings of fact entered after a 2015 bench trial, Gene Busroe purchased a 1955 Chevrolet pickup truck, planning to restore it as a retirement project. When he purchased the truck, it had a heavily rusted exterior body and needed virtually all parts and mechanical systems replaced. Busroe enrolled in classes on body and electrical work at a local technical college.

Dreamers Rod, Custom & Pick-ups N.W. Inc. operates two shops where it performs restoration work and fabricates vehicle parts. Its owners agreed to allow Busroe to store his vehicle and to use shop space to do his own restoration work. Busroe did this for several years. During the same time, he also hired Dreamers to perform specific tasks. The arrangement with Dreamers amounted to a series of oral contracts.

During this period, Busroe took the disassembled body of the truck to another business, Alternative Blasters, for "bead blasting," a process that prepares metal for painting by removing existing paint, primer, and rust, leaving only bare metal. When Alternative Blasters completed that work, Busroe transported the body pieces on a flatbed trailer to Dreamers' shop. Later, an employee of Dreamers prepared them for painting, and a Dreamers' subcontractor painted the truck.

The restoration work was complete in 2009. Busroe then participated in car shows and other events, winning some awards.

In 2011, Busroe noticed defects in the paint. On some areas of the truck body, small bubbles and blisters appeared on the surface of the paint. Since then, the bubbling and blistering has spread and become increasingly more pronounced.

In August 2013, Busroe and his spouse (collectively "Busroe") sued Dreamers.[1] Busroe contended that Dreamers' employees failed to "properly paint the vehicle" and that he incurred damages as a result. His complaint did not identify a specific legal cause of action.

During a two-day trial, the court considered the testimony of ten witnesses and several exhibits. The trial court entered a judgment in favor of Dreamers that dismissed Busroe's complaint with prejudice. Busroe appeals.

ANALYSIS

Busroe challenges finding of fact 6 insofar as it specifies September 28, 2006, as the date he delivered the truck parts from Alternative Blasters after bead blasting to Dreamers' shop. He also challenges the finding, included in both findings of fact 11 and 17, that a "three year gap" occurred between the bead blasting process and the eventual priming and painting of the vehicle in 2009.

Busroe contends no evidence in the record supports the finding that the bead blasting took place in 2006. He further claims that without this finding, the record contains no factual support for several conclusions of law. In these conclusions, the court explained that Busroe failed to establish that Dreamers' conduct proximately caused the deterioration of the paint:

_____

[1] The record on review includes only the amended complaint filed in November 2013.

-3-

3.  Plaintiff's general theory of the case is that Defendant took some action, which they did not specify, that caused rust to form on the truck, thereby causing Plaintiff damage. Here the Court concludes that the metal body of the truck was in a rusted condition at the time it was purchased by Plaintiff as shown by the photos introduced into evidence. Plaintiff sought to remove that rust by having the metal pieces beadblasted by a third party. This work was ineffective to remove all of the rust as shown by Defendant in Invoice 1428. (Exhibit 52). The Plaintiff did not prove that it contracted with Defendant to remove any, let alone all of the rust on the truck. Further, the evidence showed the Plaintiff introduced water on the truck parts in delivering [them to the] Defendant. Defendant was not responsible for causing the metal to be in a wet condition. The evidence proved that Defendant was not responsible for causing the metal parts to rust. The Plaintiff failed to show that Defendant proximately caused the rust damage to the truck. Accordingly, the Court finds in favor of the Defendant as to this claim and dismisses the complaint with prejudice.

4.  As an alternative theory of liability, viewing the Complaint more narrowly, it is possible that Plaintiff's complaint, although not specifically [pleaded], refers to the particular oral contract in which he hired Defendant [to] apply sealant to the truck after the beadblast work, and that Defendant's action in sealing the truck while it was in a wet and/or rusted condition breached a duty to Plaintiff to perform the sealant work in a "workmanlike manner." There is no dispute that this work was performed in 2006. However, the court finds that this argument must fail as well. Defendant put Plaintiff on notice of its actions ("removed the rust as best they could"), in Invoice 1428. Plaintiff had actual knowledge or should have known from the notation on the invoice that he had a rust problem under the sealant. Plaintiff seems to argue that he was ignorant to the significance of that problem because he was a novice. He claims he discovered the truck had a rust problem in 2011, when it became visible due to the bubbling of the paint job.

5.  Even if one could argue Plaintiff lacked actual knowledge of the spreading rust until 2011, the 2006 invoice at least put him on "inquiry notice" and he should have done further investigation about the rust issue at that time. This was not done. Assuming arguendo that Plaintiff had a cause of action for breach, it accrued on the date when he could have sought relief from the courts. Here, that date was on October 5, 2006. According to RCW 4.16.080, the statute of limitations ran on the oral contract three years later in October of 2009. The Complaint in this case was not filed until August of 2013, four years after the statute of limitations ran. Accordingly, under this theory, the Court finds in favor of the Defendant and dismisses the Plaintiff's claim with prejudice.

We review a trial court's decision after a bench trial to determine whether substantial evidence supports the trial court's findings of fact and whether the findings of fact adequately support the conclusions of law.[2] Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true.[3] We treat unchallenged findings of fact as verities on appeal.[4]

The record amply supports the court's finding that the bead blasting occurred in 2006. The testimony at trial established that Dreamers' employees recorded tasks performed, time spent on each task, and parts used on a daily basis. Dreamers used this information to generate customer invoices. Dreamers

---

[2] Endicott v. Saul, 142 Wn. App. 899, 909, 176 P.3d 560 (2008).

[3] Endicott, 142 Wn. App. at 909.

[4] Kitsap County v. Kitsap Rifle & Revolver Club, 184 Wn. App. 252, 267, 337 P.3d 328 (2014), review denied, 183 Wn.2d 1008 (2015).

presented evidence of an invoice it created for Busroe that included the following

entry dated September 28, 2006:

> Steve helped Gene unload the bare metal from the trailer, into the shop. (Note) Some of the parts that were exposed to the morning moist air. These parts were wet with morning fog and water spray off the tires. Steve tried to dry those areas he could see and get to with a torch and a rag.

The next entry on the same invoice, dated October 5, 2006, also records

work performed by the same Dreamers' employee, Steve Strabeck. The entry

states,

> Lay out parts and mask areas to be metal worked by owner at later time, one stepped deep pits that still had rust in them after the blast. One stepped the frame as best as we could, there was deep rust pits and heavy rust was laying in the shallowed parts of these areas.

The final entry on this invoice, dated the following day, October 6, 2006, again

records work performed by Strabeck: "Seal frame/fenders/doors and steps with

D.P. Sealer materials."

These entries support the court's finding that the bead blasting took place

in 2006. The entry describes the parts that Busroe delivered to the shop in

September 2006 as "bare metal," indicating that the delivery occurred after bead

blasting. Busroe's testimony also corroborates this inference. Although he did

not specify a date, Busroe said that after bead blasting he transported the parts

to Dreamers' shop on a flatbed trailer and covered them with only a tarp. He

acknowledged that the parts "very well" may have become wet in transit. The September 2006 entry also reflects Strabeck's concern that the bare metal parts had been exposed to moisture and water.

Strabeck testified that he remembered the delivery because the metal was exposed to water, which caused him to be concerned about rust. Busroe also confirmed that Strabeck helped him unload the parts and performed the sealing work to prepare the truck body for painting. Strabeck left his employment at Dreamers sometime around 2006. The October 5 entry further indicates that the bead blasting occurred on or before September 28 because it describes Strabeck's attempt to seal the metal despite rust remaining "after the blast."

Still, Busroe claims that he brought the vehicle parts to the shop in September 2006 before they had been bead blasted. He points to the testimony of one of the owners of Dreamers who indicated that the September 2006 entry, also designated as work order number 1 ("WO#1"), was the first invoice Dreamers generated for Busroe and therefore reflected the "first time that the project showed up at the shop." But this testimony does not undermine or contradict the court's finding that bead blasting occurred on or before September 28, 2006. Busroe also relies on his own testimony that he believed two weeks to a month elapsed between bead blasting and painting. But the court was not required to credit Busroe's unsubstantiated and vague recollection instead of

documents containing information recorded simultaneously with the events in question.

Busroe does not challenge the court's finding that according to several experts who testified at trial, "the truck should have been primed and painted within 2-3 days after the sealant was applied, to protect the metal." Busroe's testimony about timing fails to establish compliance with this protocol. Perhaps more importantly, Busroe's argument fails to appreciate that there were multiple reasons why the court determined that Dreamers was not responsible for the eventual deterioration of the paint under either a tort of contract theory of liability. The court found that the proper procedure before painting is to "blast the parts to bare metal with all rust removed, and then to apply sealer as soon as possible without allowing any moisture onto the metal." Regardless of when the bead blasting took place, the court found that the process failed to remove all rust and Busroe allowed the metal parts to be exposed to moisture and become wet. These findings alone provide sufficient support for the court's conclusion that Dreamers' conduct did not proximately cause the damage to the paint.

Substantial evidence supports the court's finding about the timing of the bead blasting work. This finding, together with other unchallenged findings, supports the court's conclusions of law. Because Busroe's challenges to the sufficiency of the evidence to support the trial court's findings fail, we need not

address his alternative arguments about the former "economic loss rule" and the statute of limitations.[5]

    Affirmed.

                                                    Leach, J.

WE CONCUR:

---

[5] See Eastwood v. Horse Harbor Found., Inc., 170 Wn.2d 380, 393-94, 241 P.3d 1256 (2010).